Filed 10/30/23  P. v. Phonsongkham CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANDY CHANH PHONSONGKHAM,<br><br>    Defendant and Appellant. | D080131<br><br><br> (Super. Ct. No. SCD281869)<br><br>ORDER MODIFYING OPINION AND DENYING PUBLICATION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed on October 6, 2023, be modified as follows:

On page 2, the last sentence of the first paragraph that begins with "Finding no error," the word "error" is deleted and replaced with "merit," so the sentence reads:

Finding no merit in his contention, we affirm the judgment.

There is no change in the judgment.

The request for publication of the opinion is denied.

_____
O'ROURKE, Acting P. J.

Copies to:  All parties

Filed 10/6/23  P. v. Phonsongkham CA4/1 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>ANDY CHANH PHONSONGKHAM,<br><br>     Defendant and Appellant. | D080131<br><br><br>(Super. Ct. No. SCD281869) |


APPEAL from a judgment of the Superior Court of San Diego County, Melinda Lasater, Judge.  Affirmed and remanded with directions.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Seth Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Andy Chanh Phonsongkham, an active member of the Oriental Killer Boys (OKB) criminal street gang, opened fire upon a group of four teenage

members of a rival gang, killing one boy. Although the trial court granted the defense motion to bifurcate the gang enhancement allegations (Pen. Code, § 186.22, subd. (b)(4) & (5)), it permitted the prosecution to introduce gang evidence to prove Phonsongkham committed the shooting to retaliate against the rival gang for their assault of a fellow OKB member the same day. The jury convicted Phonsongkham of a special circumstance murder, among other charges. Phonsongkham's sole contention on appeal is that the trial court abused its discretion and violated newly-enacted Penal Code section 1109 and Evidence Code sections 1101 and 352 by admitting the gang evidence at the bifurcated trial on the substantive crimes. Finding no error in his contention, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*The Drive-By Shooting*

Linda Vista 13 (LV13) is a criminal street gang that claims territory in the Linda Vista neighborhood of San Diego. Kelly Street is in the heart of LV13's territory; the sidewalks, walls, and fences that border the street are covered in LV13 gang graffiti. Tiny Locos (TLS) is a subset of LV13.

The OKB criminal street gang operates in Southeast San Diego, in an area that includes 49th Street. OKB is affiliated with a rival gang of LV13. Phonsongkham and his friend, Anthony L., are OKB members.

At around 5:30 p.m. on May 23, 2019, Anthony was standing in front of a smoke shop in LV13 territory when a van pulled up. Someone in the van said "Chino" and "go get him." Several juvenile LV13 members (including C.L. and C.C.) exited the van, walked up to Anthony, and asked if he knew where he was. Anthony answered, "I'm from OKB" and "yeah, I'm in your turf." The juveniles beat up Anthony and fled.

2

Minutes after the beating ended, Anthony called Phonsongkham and sent texts to him with a geographic "pin" that pointed to a location just behind the strip mall where Anthony had been assaulted. Phonsongkham texted back, "On my way!" Phonsongkham then drove from Southeast San Diego to Linda Vista—a drive that takes about 15 minutes—and arrived just before 6:00 p.m.

At the same time, shortly before 6:00 p.m., 16-year-old Carlos V. left his house in Linda Vista and joined his friends, C.L., C.C., and J.C., outside. Three minutes later, as Carlos, C.L., J.C., and C.C. were walking together down Kelly Street, Phonsongkham drove up to them in a car, screeched to a halt, yelled "fuck TLS," and started shooting. C.L., J.C., and C.C. immediately threw themselves to the ground. Carlos, who had remained standing with his back to the street, fell as shots were fired. Phonsongkham fired five shots, then sped away.

As the boys were getting up, Carlos told his friends that he had been shot. They took Carlos's jacket off and pulled up his shirt to see a bullet wound in the middle of his chest. Carlos lost consciousness. A concerned passerby, who heard the gunshots and saw that Carlos was bleeding, pulled up to the boys in his pickup truck and told them to put Carlos inside. The passerby drove Carlos and the boys to the nearest hospital, but by the time they arrived, Carlos had already died. He had been struck with a single bullet that entered his body through the left side of his back, traveled through his left lung and heart, and exited through the right side of his chest.

## II.

### *Investigation and Arrest*

The shooting happened in daylight, and several neighbors called 911 to report it. Police officers responding to the scene found four spent 9-millimeter bullet casings in the middle of the street.

One neighbor told a responding officer that his house had been hit by a bullet. When detectives examined the house, they concluded that three bullets had hit the structure, including at the fence, gate, and an exterior window. One detective described the bullet holes as "spread out."

Eyewitnesses who saw the shooter told officers he was a heavyset Asian male in his 20s wearing a white t-shirt and red-brimmed baseball cap. They described his vehicle as a small, older, gold or metallic-colored sedan of Japanese make—either a Honda, Toyota, or Mitsubishi.

After learning the decedent and his friends were LV13 gang members, investigating officers suspected the shooting was gang related. A detective checked law enforcement databases and determined that Phonsongkham had prior law enforcement contacts while driving a vehicle that matched eyewitness descriptions of the shooter's vehicle.

Another detective reviewed video footage from the surveillance cameras of a neighbor's home and a nearby school, which showed a vehicle that matched witnesses' descriptions driving down Kelly Street near the time of the shooting. The detective observed that in addition to having the features identified by eyewitnesses, the vehicle also had 10-point rims, a spoiler, and a white sticker on one window.

A detective staked out a house on 41st Street associated with Phonsongkham. When the detective arrived at the house, it was dark and there were no vehicles in the driveway. While the detective waited, he

4

received information that Phonsongkham had prior law enforcement contacts in a 1993 Honda Accord registered to someone at the 41st Street address. He also received a screenshot of a Facebook photograph of a group that included Phonsongkham wearing a red baseball cap.

At around 9:45 p.m., the detective saw Phonsongkham pull into the driveway of the 41st Street house in an older gold Honda Accord. He was wearing a red baseball cap and a white t-shirt. He got out of the car, walked to the trunk and opened it, reached inside and appeared to rack a handgun. He took a dark-colored bag from the trunk, closed it, and entered the house through the front door. After a few seconds, lights inside the garage were turned on.

As the detective continued to wait, he received screenshots of surveillance video of the crime scene. The vehicle in the screenshots appeared to match the car Phonsongkham was driving when he arrived at the 41st Street house.

Phonsongkham remained inside the house for around 40 minutes. When he emerged, he had changed his clothing. He got in his Honda Accord and drove a few blocks before police pulled him over and took him into custody. A spent bullet casing was found inside his car on the floorboard in front of the driver's seat.

An eyewitness to the shooting was brought to Phonsongkham for a field identification. She positively identified Phonsongkham as the shooter and said she recognized his Honda Accord as the shooter's vehicle.

The Honda Accord was impounded and a crime scene specialist who processed the car collected the spent bullet casing from the floorboard as well as two cell phones that were inside the car.

Police searched the 41st Street house. They determined that Phonsongkham had been living in the garage. They found a 9-millimeter Glock handgun with a box of 9-millimeter ammunition between the box spring and mattress of Phonsongkham's bed. They also found a cell phone, red baseball caps, and several white t-shirts in the garage bedroom. Phonsongkham's DNA was on the handgun.

A criminalist from the San Diego Police Department examined ballistic patterns on the four spent bullet casings recovered from the crime scene and the fifth casing found on the floorboard of Phonsongkham's car. She determined that all five casings had been fired from Phonsongkham's handgun.

III.

*Charges, Trial, and Sentence*

Phonsongkham was charged with the murder of Carlos V. (Pen. Code, § 187, subd. (a); count 1) with the special circumstance it was an intentional murder perpetrated by means of intentionally discharging a firearm from a motor vehicle (Pen. Code, § 190.2, subd. (a)(21); attempted first degree murders of J.C., C.C., and C.L. (Pen. Code, §§ 664, 187, subd. (a), 189; counts 2–4); and shooting at an inhabited dwelling house (Pen. Code, § 246; count 5). All five counts included firearm enhancement allegations (Pen. Code, § 12022.53, subds. (b)–(d)) and were alleged to have been committed for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1) & (5); counts 1–4; *id*., subd. (b)(1) & (4); count 5)

The case went to jury trial in October 2021. In a pretrial hearing, the trial court granted a defense motion to bifurcate the gang enhancement allegations from the trial on the substantive charges, special circumstances and firearm enhancement allegations.

6

At the bifurcated trial, the prosecution's theory was that Phonsongkham committed the shooting against rival LV13 to retaliate for the earlier assault of his fellow OKB gang member. Over 10 days, the prosecution established the facts (as set forth above) through a total of 40 witnesses, including C.L., J.C., C.C., and more than a dozen neighbors who lived near the crime scene and witnessed the shooting, as well as numerous law enforcement witnesses who investigated the shooting. At the conclusion of the prosecution's case-in-chief, the defense rested without calling witnesses.

In closing arguments to the jury, the prosecutor argued Phonsongkham was the shooter and had committed murder and attempted murders of the first degree. The prosecutor told the jury LV13's four-on-one assault of Anthony was a sign of disrespect Phonsongkham would not tolerate, so he decided to retaliate with the "death of a rival." Pointing to the evidence that Phonsongkham had traveled from Southeast San Diego to Linda Vista with a loaded gun, she argued he had the duration of the drive to deliberate and premeditate a killing—to "think about death."

Defense counsel sought to persuade the jury that the percipient eyewitnesses were not credible, and that the prosecution had fallen short of its burden of establishing that Phonsongkham was the shooter. Defense counsel argued that if Phonsongkham was the actual shooter, there was insufficient evidence he had intended, premeditated, or deliberated on shooting the victims. He claimed the prosecution's theory that the crimes were gang-motivated was unfounded because there was no evidence Anthony was a gang member. Referring to Phonsongkham's gang moniker "Temper," defense counsel told the jury Phonsongkham "had a temper" and shot at the juveniles because he was provoked and angry after learning "what happened

7

to his friend." Defense counsel also characterized the shooting as a "wild spraying" of bullets, and argued the lack of "aiming" showed Phonsongkham lacked intent to kill.

After deliberating for less than two days, the jury convicted Phonsongkham of first degree murder and returned a true finding on the special circumstance allegation. It convicted Phonsongkham of the attempted murders of J.C., C.C., and C.L. as charged in counts 2 through 4, but was unable to reach a unanimous decision as to whether the attempted murders were willful, deliberate, and premeditated. The jury also found Phonsongkham guilty of shooting at an inhabited dwelling as charged in count 5 and found true the firearm enhancement allegations attached to all five counts. The bifurcated gang enhancement allegations were dismissed on the prosecution's motion due to the unavailability of an essential witness.

Phonsongkham was sentenced to an indeterminate term of life without the possibility of parole for the special circumstance murder in count 1; the midterm of seven years for the attempted murder in count 2; two years, four months (one-third the midterm of seven years) on each of the other attempted murders in counts 3 and 4; and one year, eight months (one-third the midterm of five years) on the shooting of an inhabited dwelling in count 5. The court imposed five consecutive terms of 25 years to life for the firearm enhancement allegations under Penal Code section 12022.53, subdivision (d), attached to each of the five counts; the court stayed sentence on all of the remaining firearm enhancement allegations. The total sentence was 13 years and four months, plus 125 years to life, plus life without the possibility of parole.

DISCUSSION

I.

*Phonsongkham's Claims of Evidentiary Error Lack Merit*

A.   *Additional Background*

The parties brought three motions in limine that are relevant to Phonsongkham's appellate claims of evidentiary error.

As previously noted, the defense moved to bifurcate the Penal Code section 186.22 gang enhancement allegations from the trial of the substantive crimes. The defense argued the predicate crimes the prosecution would use to demonstrate a "pattern of criminal gang activity" under subdivisions (b) and (f) of section 186.22 would be highly inflammatory if admitted during the trial of the substantive offenses.

The prosecution also moved to admit gang evidence to establish motive, identity, intent, and premeditation relevant to Phonsongkham's commission of the substantive crimes; to explain witnesses' fear about testifying; and to prove the elements of the Penal Code section 186.22 gang enhancement allegations. The prosecution sought an order permitting it to introduce the following nine categories of gang evidence: (1) gang expert testimony on the existence of OKB, including number of members, territory, and common signs; (2) gang expert testimony on the primary activities of OKB members; (3) certified copies of court records from three criminal cases to prove the predicate crimes necessary to establish a "pattern of criminal gang activity" under section 186.22; (4) testimony and photographs related to the gang participation of individuals whose convictions would be used to establish the pattern of gang activity; (5) gang expert opinion on Phonsongkham's membership and active participation in OKB, including interpretation of his tattoos, associations with other OKB members, photographs indicating gang

9

allegiance, and correspondence with other OKB members; (6) gang expert testimony on the rivalries and alliances of OKB; (7) gang expert testimony on the role of respect in Asian criminal street gangs and the expected responses to disrespect; (8) gang expert testimony on the culture and habits of Asian criminal street gangs; and (9) gang expert opinion in response to hypothetical fact patterns on how and whether certain crimes would be committed in association with or for the benefit of a criminal street gang.

The defense filed a competing motion in limine to exclude evidence of Phonsongkham's OKB gang membership and activities in which it objected to the introduction of gang evidence under Evidence Code sections 1101 and 352.

A hearing on the motions in limine took place in October 2021. At that time, Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), had passed but was not yet effective. (Stats. 2021, ch. 699, § 5, eff. Jan. 1, 2022.) Among other things, Assembly Bill 333 created Penal Code section 1109, which requires bifurcation of section 186.22 gang enhancement allegations upon the defendant's request.

During the hearing, defense counsel and the prosecutor recommended that the trial court grant bifurcation in accordance with the soon-to-be-effective Penal Code section 1109. The prosecutor told the court the imminent change in law made it "wise to bifurcate the predicates" since the judgment, if any, would not be final by the time the new law went into effect; granting bifurcation would avoid a possible appellate reversal for failure to comply with its mandate. The court granted the bifurcation motion.

The trial court then considered whether the prosecution's gang evidence would be admissible during the trial of the substantive crimes. The prosecutor argued gang evidence was relevant to the murder and attempted

murder charges because it tended to establish Phonsongkham's identity as the perpetrator of the shootings as well as his motive for killing and intent to kill. She explained the prosecution's theory that OKB and LV13 were rival criminal street gangs, and Phonsongkham was a member of OKB who committed the shooting in retaliation for LV13's earlier assault on his fellow gang member. The prosecutor asserted that gang evidence was "baked into this case," and the offenses would not be understandable to the jury without evidence of the gang context in which they were committed.

Defense counsel sought to limit the scope of gang evidence that would be admitted. He appeared to argue that the gang evidence was only relevant to the bifurcated gang allegations, not to the substantive crimes. The trial court responded that notwithstanding its decision to bifurcate the gang allegations, "there is evidence that can and is admissible . . . for identity, motive, and intent to kill . . . . [I]t's grounded in the gang overtones to this entire situation." Defense counsel conceded the "entire case is baked with gang issues," meaning that "parsing them out becomes very difficult."

The trial court engaged in an extended discussion with counsel for both sides about the nature and admissibility of the proposed gang evidence. When the prosecutor discussed her intent to introduce a variety of evidence to prove Phonsongkham was an OKB member, including field interviews, cell phone evidence, and a jail incident in which fresh OKB graffiti was found in a holding cell after Phonsongkham left it, defense counsel objected that this evidence was irrelevant and prejudicial under Evidence Code section 352. The court ruled it would admit "limited" evidence to support the theory that Phonsongkham was an OKB member, but left the specifics for future determination because it had not yet heard the evidence. It suggested the defense had the option of stipulating to gang membership to avoid

11

introduction of the evidence, and that if no stipulation was forthcoming, it would "have to do [a] 352 evaluation."

After the hearing, the trial court issued a minute order granting the prosecution's motion to admit gang evidence in part and denying the defense motion to exclude gang evidence in part. In this order, the court made the following rulings regarding the admissibility of gang evidence during the first phase of the bifurcated trial: gang expert testimony was admissible on the existence of the OKB criminal street gang, including the number of its members, its territory, and "common name/sign/symbol"; gang expert testimony on the rivalries and alliances of the OKB gang was admissible, except that the history of how the rivalry between OKB and LV13 developed was not; gang expert opinion testimony regarding Phonsongkham's membership and active participation in OKB, including interpretation of his tattoos, prior admissions of membership to officers on the street, associations with other OKB members, and possession of gang paraphernalia, including social media postings and phone content demonstrating association or membership in OKB was admitted "subject to possible stipulation or 352 analysis" (emphasis omitted); gang expert testimony on the culture and habits of Asian criminal street gangs, the role of respect within Asian criminal street gang sub-culture, including the forms disrespect can take and expected responses to disrespect, was admitted "when relevant to the gang dynamics" (emphasis omitted).

The remaining categories of evidence identified in the prosecution's motion (predicate gang crimes, gang expert testimony on the primary activities of OKB, and gang expert opinion on hypothetical crimes) were deemed admissible "as to the bifurcated gang allegation only." (Emphasis omitted.)

12

B.    *Gang Evidence Challenged on Appeal*

Relevant to this appeal, the following gang evidence was admitted during the initial phase of the bifurcated trial:[1]

(1)    Detective Eddie Escamilla, an expert on Linda Vista gang sets, identified two active gangs in the area: LV13, and its rival gang, the Linda Vista Crips. The juveniles who assaulted Anthony were known or suspected LV13 gang members. He explained the importance to a gang of defending gang territory; targeting rival gang members who enter a gang's claimed territory; " 'putting in work' " by backing up fellow gang members who are assaulted; and avoiding any appearance of cooperating with law enforcement, also known as "snitching," such as by talking openly with the police or testifying in court.

(2)    Detective Dan Caropreso, an expert on Asian gangs including OKB, described OKB's hand signs and tattoos, and testified that OKB claims territory in an area of Southeast San Diego that included 49th Street. He was shown five screenshots from Phonsongkham's Facebook account and testified they showed Phonsongkham "throwing" gang signs or standing next to others who were throwing gang signs, and they included an image of 49th Street.

(3)    Detective Nestor Hernandez described the mission of the gang suppression unit of the San Diego Police Department. He explained that law enforcement collected information about gang members because "they are usually involved in some type of criminal activity, either at the time that they were contacted or sometime later on."

(4)    The jury was shown numerous photographs from the cell phones recovered from Phonsongkham's garage bedroom and 1993 Honda Accord. They included at least one image of him holding a gun, possibly a Glock.

---

[1]    Phonsongkham did not stipulate to his membership in the OKB criminal street gang.

13

(5)     The jury also heard the following testimony about field interviews of Phonsongkham:  (i) in October 2018, Officer Michael McGruder stopped Phonsongkham after seeing him with another person apparently spraying gang graffiti that said "OMC" for Oriental Mafia Crips, a sister gang of OKB (two officers testified about this field interview: Officer McGruder and his partner, Officer Adam Schrom); (ii) in November 2015, Officer Christina Berg stopped and interviewed Phonsongkham, who said he was living on 44th Street within known OKB gang territory; (iii) in April 2017, Officer Gerald Perrin conducted a traffic stop of Phonsongkham and saw that he had a 49th Street tattoo on his left hand signifying OKB territory as well as a hat that may have been associated with OKB.

(6)     Deputy Sheriff John Barrios, who is assigned to the superior court in downtown San Diego, testified that in July 2020 (i.e., after Phonsongkham's arrest for the instant offenses), he found fresh OKB graffiti carved in the wall of a holding cell after Phonsongkham was placed in it alone while he was being transported to court.

C.     *Standard of Review*

Phonsongkham contends the trial court erred and violated Penal Code section 1109, Evidence Code sections 1101, subdivision (b), and 352, as well as his federal and state constitutional rights to due process of law, by admitting the six categories of gang evidence listed above.  We review a trial court's rulings on the admissibility of evidence for an abuse of discretion. (*People v. Thomas* (2023) 14 Cal.5th 327, 358 (*Thomas*); *People v. Chhoun* (2021) 11 Cal.5th 1, 31 (*Chhoun*).)  "We do not disturb the trial court's ruling unless it was arbitrary, capricious, or made in a ' "patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Thomas*, at p. 358.)

D.     *No Violation of Penal Code Section 1109*

Phonsongkham's first challenge to the admission of the gang evidence relies on newly enacted Penal Code section 1109.  He contends section 1109 is retroactive under the rule of *In re Estrada* (1965) 63 Cal.2d 740 because it

14

benefits criminal defendants. Although he believes the trial court complied with section 1109 insofar as it granted bifurcation of the gang allegations, he argues the scope of gang evidence admitted to prove the substantive crimes violated section 1109. He claims that by requiring bifurcation of gang allegations upon defense request, the Legislature has "given a clear indication of its concern of the prejudice inherent in gang evidence."

Appellate courts are currently divided on whether Penal Code section 1109 applies retroactively, and this issue is now before the California Supreme Court. (Compare *People v. Burgos* (2022) 77 Cal.App.5th 550, 566–567, review granted July 13, 2022, S274743 [§ 1109 applies retroactively under *Estrada*]; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128–1131 (*Ramos*) [same]; *People v. Montano* (2022) 80 Cal.App.5th 82, 105–108 (*Montano*) [same]; with *People v. Perez* (2022) 78 Cal.App.5th 192, 207, review granted Aug. 17, 2022, S275090 [§ 1109 is not retroactive]; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65, review granted Aug. 17, 2022, S275341 [same]; *People v. Boukes* (2022) 83 Cal.App.5th 937, 948, review granted Dec. 14, 2022, S277103 [same].) In *People v. Tran* (2022) 13 Cal.5th 1169, 1208, our Supreme Court declined to resolve this split.

We do not need to decide this issue. Even if we assume Penal Code section 1109 is retroactive, it did not disturb existing case law holding that gang evidence may be admitted to prove substantive crimes. Prior to the enactment of Assembly Bill 333, the California Supreme Court repeatedly affirmed that gang evidence is admissible to prove crimes even in cases in which no gang allegations have been asserted. "The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense. [Citation.] 'Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership,

15

signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.' " (*Chhoun*, *supra*, 11 Cal.5th at p. 31.)

The enactment of Penal Code section 1109 did not change this rule. Section 1109 creates a procedure for bifurcating section 186.22 gang enhancement allegations. It states, in relevant part, "If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) . . . of Section 186.22 shall be tried in separate phases as follows: [¶] (1) The question of the defendant's guilt of the underlying offense shall be first determined[;] [¶] (2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) . . . of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement. Allegations that the underlying offense was committed for the benefit of, at the direction of, or in association with, a criminal street gang and that the underlying offense was committed with the specific intent to promote, further, or assist in criminal conduct by gang members shall be proved by direct or circumstantial evidence." (Pen. Code, § 1109, subd. (a).)

This statutory text is devoid of language limiting the scope of evidence admissible to prove the substantive crimes underlying any gang allegations. The absence of any such limitation is meaningful, as we are required to derive the Legislature's intent from the words of the statute it enacted. (*People v. Leal* (2004) 33 Cal.4th 999, 1007; see *ibid.* [" 'When the language of a statute is "clear and unambiguous" and thus not reasonably susceptible of more than one meaning, " ' " 'there is no need for construction, and courts should not indulge in it.' " ' " ' "].) Moreover, " ' "[t]he Legislature is presumed

16

to know the existing law and have in mind its previous enactments when legislating on a particular subject." ' " (*Montano*, *supra,* 80 Cal.App.5th at p. 113.) Despite its presumed awareness of prevailing precedent holding gang evidence admissible to prove substantive criminal charges, the Legislature did not alter this rule when it enacted Penal Code section 1109. We may not rewrite section 1109 to conform to an unexpressed legislative intent. (*Hale v. Superior Court* (2014) 225 Cal.App.4th 268, 276 [courts must avoid " 'rewriting statutes to find an unexpressed legislative intent' "].) " 'Doing so would violate the cardinal rule that courts may not add provisions to a statute.' " (*Montano*, at p. 113.)

Moreover, other courts have interpreted Penal Code section 1109 not to create new limitations on the admissibility of gang evidence to prove substantive crimes. "[N]othing in Assembly Bill 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges." (*Ramos*, *supra*, 77 Cal.App.5th at p. 1132.) The California Supreme Court has implicitly endorsed this view. In *People v. Tran*, *supra*, 13 Cal.5th at page 1208, our high court rejected the defendant's claim that failure to bifurcate gang enhancement allegations under section 1109 constitutes structural error, reasoning that it "ha[s] held that gang evidence, even if not admitted to prove a gang enhancement, may still be relevant and admissible to prove other facts related to a crime."

For these reasons, we reject Phonsongkham's claim that Penal Code section 1109 required exclusion of gang evidence in the bifurcated trial on the substantive crimes.

E.    *No Violation of Evidence Code Section 1101, Subdivision (b)*

Phonsongkham's next claim of evidentiary error under Evidence Code section 1101 is directed at the gang evidence described in categories (5)(i) and

17

(5)(iii) (the testimony of Officers McGruder, Schrom, and Perrin) and (6) (the testimony of Deputy Barrios) in part B above. He maintains that in each instance, "officers described [him as] being involved in some type of gang activity that amounted to criminal conduct such as illegally tagging graffiti or vandalism." He also contends that "at one point, Officer Perrin testified that [he] was arrested, thus leaving the jury to surmise about what caused the arrest." He argues the prior criminal or bad acts reflected in this testimony were not similar enough to the charged offenses to be admissible under section 1101, subdivision (b). We are not persuaded by these contentions.

"With certain exceptions not relevant here, Evidence Code section 1101, subdivision (a), provides that 'evidence of a person's character'—whether in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct—'is inadmissible when offered to prove [the person's] conduct on a specified occasion.' This prohibition, however, does not preclude 'the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact . . . other than [the person's] disposition to commit such an act,' including 'motive, opportunity, intent, preparation, [or] plan.' " (*People v. Valdez* (2012) 55 Cal.4th 82, 129.) "In other words, [section 1101] allows the admission of evidence of criminal activity other than the charged offense ' " 'when such evidence is relevant to establish some fact other than the person's character or disposition.' " ' " (*Thomas, supra*, 14 Cal.5th at p. 358.)

First, Phonsongkham is incorrect that Officer Perrin's testimony about an arrest left the jury to imagine what Phonsongkham did to get arrested. According to Perrin's testimony, the arrest took place "on May 23rd into the early morning hours of May 24th, 2019[.]" Plainly, the arrest was for Phonsongkham's commission of the current shooting offenses, not an

18

uncharged or unidentified act of misconduct.  Perrin's testimony created no danger of juror speculation about the conduct that precipitated the arrest.

Second, Phonsongkham relies on flawed reasoning and inapposite cases to the extent he claims the testimony of Officers McGruder, Schrom, and Deputy Barrios was inadmissible under Evidence Code section 1101, subdivision (b), because the bad acts to which they testified (graffiti or vandalism) were insufficiently similar to the charged homicide offenses.  This argument incorrectly assumes the prosecution offered the evidence to prove that a similarity between the prior and current offenses existed.  Phonsongkham relies on cases such as *People v. Ewoldt* (1994) 7 Cal.4th 380 (*Ewoldt*), and *People v. Balcom* (1994) 7 Cal.4th 414, that addressed the admissibility of evidence of uncharged misconduct under subdivision (b) of section 1101 "[t]o establish the existence of a common design or plan." (*Ewoldt*, at p. 403; *Balcom*, at pp. 424–425.)  Under this theory of admissibility, "evidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts." (*Ewoldt*, at p. 403.)  But here the prosecution was not trying to prove the existence of a "common design or plan." (*Ibid.*)  Rather, it offered the evidence of Phonsongkham's field interviews (which included references to his possible spraying of gang graffiti) and the incident when he carved OKB graffiti in the holding cell not to prove the shooting was a recurrence of earlier, similar incidents—plainly, there was no such similarity—but to prove he was a longstanding OKB member.  It was this gang affiliation which, in turn, assertedly supplied Phonsongkham with both

19

the motive to retaliate against LV13 for its assault of his fellow gang member by committing a shooting at LV13 gang members, and the intent to kill them.

This was a different factual theory from the common plan or scheme theory discussed in *Ewoldt*, but it was no less viable to support admission under Evidence Code section 1101, subdivision (b). It is settled that the prosecution may offer evidence of uncharged misconduct to prove issues of motive or intent. (Evid. Code, § 1101, subd. (b).) When offered for this purpose, " 'the probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, *so long as the offenses have a direct logical nexus.*' " (*Thomas*, *supra*, 14 Cal.5th at pp. 361–362, italics added; see *People v. Spector* (2011) 194 Cal.App.4th 1335, 1381 [admission under § 1101, subdivision (b), is permissible where " 'the uncharged act evidences the existence of a motive, but the act does not supply the motive. . . . [T]he motive is the cause, and both the charged and uncharged acts are effects. *Both crimes are explainable as a result of the same motive.*' "].)

Such a direct logical nexus between the officers' testimony, Phonsongkham's OKB membership, and Phonsongkham's commission of the charged offenses exists here, as our discussion of the prosecution's factual theory has already established. Indeed, in his opening brief on appeal (albeit in a different section from the one in which he challenges admission of the gang evidence under Evidence Code section 1101), Phonsongkham implicitly concedes the existence of a logical connection between the challenged evidence and issues of motive, identity, and intent. He states: "The court's bifurcation of gang evidence [*sic*] meant that the People's case would be hamstrung without an ability to prove an underlying gang basis. Therefore, in order to prove motive, identity or intent, evidence of appellant's gang

20

membership or association with a gang, gang culture, or 'gang dynamics' as the court framed it was relevant to these matters. In this respect, courts have repeatedly held it is proper to introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent."

The conclusion that the prosecution's theory of admissibility under Evidence Code section 1101, subdivision (b), was a sound one is supported by *People v. Valdez, supra*, 55 Cal.4th 82, in which our high court considered the propriety of the admission of gang evidence to prove motive and identity under a factual theory akin to the one pursued by the prosecution here. In *Valdez*, "the prosecution's theory was that the Mexican Mafia had directed the Sangra gang to kill Dido Moreno because he had dropped out of the Mexican Mafia, and that Sangra gang members—including defendant and [his confederate]—obeyed that order because of their own gang allegiances." (*Id.* at pp. 130–131.) The Court held evidence of the defendant's and his confederate's "membership in and level of commitment to [the] Sangra [gang]" was admissible under section 1101, subdivision (b), to prove the identity of the murderers as well as their motive to commit a gang-related killing. (*Ibid.*)

We conclude the testimony about Phonsongkham participating in spraying gang graffiti and carving the OKB gang name in a holding cell was not inadmissible under Evidence Code section 1101, subdivision (b), for the purposes of proving motive, intent, and identity, even though the acts of misconduct were not similar to the charged offenses.

F.     *No Violation of Evidence Code Section 352*

Finally, Phonsongkham contends the gang evidence described in categories (1) through (6) above was prejudicial and should have been excluded under Evidence Code section 352 because it was cumulative. He

21

claims the trial court exceeded the point of " 'just enough, but no more' " that is the "tipping point beyond which prejudice outweighs probity."[2] He contends the defense theory regarding his mental state—that Anthony's text message that said " 'I love you' " with "a big emoji with the arms out" showed his relationship with Anthony was not a gang relationship, and that Phonsongkham acted in a heat of passion—was "all but obliterated from serious jury consideration by the overlay of gang evidence." He also appears to contend that section 352 is an ineffective safeguard to protect criminal defendants against the prejudice created by the admission of gang evidence.

"The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense. [Citation.] 'Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.' [Citation.] Even when it is relevant, however, 'courts should carefully scrutinize evidence of a defendant's gang membership because such evidence "creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged." ' " (*Chhoun, supra,* 11 Cal.5th at p. 31.)

---

[2] Within his arguments advancing an Evidence Code section 352 challenge to the trial court's admission of gang evidence, Phonsongkham appears to reassert his earlier position that Assembly Bill 333 limits the scope of gang evidence that can be introduced during the trial of criminal offenses other than Penal Code section 186.22 gang enhancement allegations. Because we have already considered and rejected this position, we do not readdress it here.

To comply with Evidence Code section 352, "[t]he trial court must find that the evidence has substantial probative value that is not outweighed by its potential for undue prejudice." (*People v. Williams* (2009) 170 Cal.App.4th 587, 610 (*Williams*).) "When the evidence has probative value, and the potential for prejudice resulting from its admission is within tolerable limits, it is not *unduly* prejudicial and its admission is not an abuse of discretion." (*People v. Tran* (2011) 51 Cal.4th 1040, 1049 (*Tran*).)

Cumulative evidence "may be inadmissible under Evidence Code section 352." (*Williams*, *supra*, 170 Cal.App.4th at p. 611.) "Although no bright-line rules exist for determining when evidence is cumulative, . . . the term 'cumulative' indeed has a substantive meaning, and the application of the term must be reasonable and practical." (*Ibid.*) "The prejudicial effect of evidence defendant committed a separate offense may, of course, outweigh its probative value if it is merely cumulative regarding an issue not reasonably subject to dispute." (*Tran*, *supra*, 51 Cal.4th at p. 1049.)

As we discuss next, Phonsongkham fails to establish that the trial court's admission of the challenged gang evidence, either individually or cumulatively, violated these standards.

1. *The Challenged Gang Evidence Was Not Prejudicial When Considered Individually*

   i) Detective Escamilla—Category (1)

The People argue that Phonsongkham forfeited his appellate challenge to Detective Escamilla's testimony about LV13 and the victims' membership in LV13, because his motion in limine only sought to exclude gang evidence related to him, not the victims, and defense counsel did not object to Escamilla's testimony at trial. We agree. (See *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 773 [claims of error in admission of gang

evidence forfeited where defendant did not raise an objection under Evid. Code, § 352].)

Phonsongkham responds that he preserved his evidentiary challenge to the detective's testimony by requesting bifurcation of the gang allegations. But his bifurcation motion sought different relief on a different legal basis. It was therefore inadequate to preserve his current claim of evidentiary error under Evidence Code section 352. "[N]umerous decisions by [the California Supreme Court] have established the general rule that trial counsel's failure to object to claimed evidentiary error *on the same ground* asserted on appeal results in a forfeiture of the issue on appeal." (*People v. Dykes* (2009) 46 Cal.4th 731, 756, italics added.) Phonsongkham asks us to exercise our discretion to overlook the forfeiture. However, we are not authorized to do so where, as here, the forfeited issue involves the admission of evidence. (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6; Evid. Code, § 353.)

The vast majority of Detective Escamilla's testimony addressed the territory of LV13, its subsets and rival gangs, and the LV13 gang membership of Anthony's assailants. As Phonsongkham has forfeited his appellate challenge to the admission of this testimony, we do not consider whether it was prejudicial.

To a lesser extent, Detective Escamilla also explained gang dynamics, including concepts of defending gang territory, targeting rival gang members who enter a gang's claimed territory, " 'putting in work' " by backing up fellow gang members, and avoiding the appearance of cooperating with law enforcement. This testimony was highly probative of issues relevant to determining Phonsongkham's guilt of the charged crimes, including his motive and intent in committing the shooting. It was also relevant to explain why certain percipient witnesses (particularly J.C. and C.C.) were reluctant,

24

even hostile, when questioned by counsel at trial. Phonsongkham fails to establish that the probative value of this testimony was substantially outweighed by its prejudicial effect.

ii)     Detective Caropreso—Category (2)

Detective Caropreso's testimony about OKB's territory, common gang tattoos, and gang signs, including his testimony that certain images showed Phonsongkham "throwing" OKB gang signs, was relevant for the jury's interpretation of photographs and testimony offered as circumstantial evidence of Phonsongkham's membership in OKB and was not unduly prejudicial.

iii)     Detective Hernandez—Category (3)

Detective Hernandez participated in investigating the current crimes. His background with the San Diego Police Department included assignments with its street gang unit. The only part of Hernandez's testimony that Phonsongkham challenges on appeal is his statement that gang members "are usually involved in some type of criminal activity, either at the time that they were contacted or sometime later on."

Detective Hernandez made this statement in response to the prosecutor's question asking why the San Diego Police Department's gang unit collected information about gang members.[3] Hernandez's answer was responsive to this question and was relevant to explain the purpose of conducting field interviews of apparent gang members. Although this

---

[3]     Defense counsel did not object to the prosecutor's question or move to strike Detective Hernandez's statement. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 81–82 [failure to object or move to strike testimony forfeits the argument the testimony was inadmissible].) Although counsel's inaction forfeits Phonsongkham's current appellate challenge, we address the challenge on the merits because the People have not asserted forfeiture.

25

statement arguably imputed a criminal disposition to gang members, its prejudicial impact was mitigated by evidence of the specific field interviews involving Phonsongkham. The only crime disclosed in the testimony describing his field interviews was that of spraying graffiti, and one in which his only role involved serving as a lookout while his companion did the actual spray painting. When considered in context, Hernandez's testimony was "no stronger and no more inflammatory than the [evidence] concerning the charged offenses." (*Ewoldt*, *supra*, 7 Cal.4th at p. 405.)

### iv) Cell Phone Photos—Category (4)

As for the admission of what Phonsongkham describes as "numerous photos over a period of years that included [him] holding guns, in one possibly a Glock [i.e., the same model of gun as the handgun found under his mattress], gang graffiti with the word 'Temper' (his aka) and screen shots of [him] making gang signs alone or with others," he fails to establish the photographs were unduly prejudicial.[4]

---

[4] We are impeded in our ability to determine whether the photographs were prejudicial because we have not been provided with a record revealing what they showed. The photographs were marked as Exhibits 226 through 263 and were shown to the jury during the testimony of Detective Marco Perez. Except for one instance that we discuss below, Perez was not asked to describe what the photographs depicted. Phonsongkham did not request the transmission of Exhibits 226 through 263 to this court for consideration and review as required by California Rules of Court, rules 8.320 and 8.224. (See Cal. Rules of Court, rules 8.320(e) ["Exhibits admitted in evidence . . . are deemed part of the record, but may be transmitted to the reviewing court only as provided in rule 8.224."], 8.224(a)(1) ["a party wanting the reviewing court to consider any original exhibits that were admitted in evidence . . . but that were not copied in the clerk's transcript under rule 8.122 or the appendix under rule 8.124 must serve and file a notice in superior court designating such exhibits"].) It is the appellant's burden to present a record adequate for review and to affirmatively demonstrate error. (*People v. Whalen* (2013) 56 Cal.4th 1, 85; see *ibid.* [where defendant fails to supply a

The photographs were recovered from the three cell phones found in Phonsongkham's garage bedroom and Honda Accord.  They were introduced in evidence through the testimony of Detective Perez, who testified about law enforcement's collection of evidence from the cell phones.  According to Perez, the photographs were taken between 2014 and 2018.

After 10 of the cell phone photographs were shown to the jury, defense counsel objected that the photographs were cumulative.  The prosecution responded that they were admissible to support the gang expert's anticipated opinion that Phonsongkham was an OKB member, and to show that Phonsongkham was a longstanding member of OKB.  The trial court overruled the objection.  It explained that it did not find the contents of the photographs to be unduly prejudicial to the defense, and that the number of photographs was arguably helpful to the defense because it showed "the degree of [his] gang involvement" which was "important" to the heat of passion defense because "that's why he had such a strong reaction."  Defense counsel agreed, saying "You are on the right track."

Phonsongkham does not challenge this reasoning, which both establishes the probative value of the photographs and tends to refute his appellate claim that the photographs were prejudicial.  Nor are we persuaded there was any such prejudice.  Even if we assume, as he claims, that the

---

record adequate to review his claim of error, "[the claim] fails"].)  We cannot determine whether the photographs were prejudicial without knowing what they revealed.  Phonsongkham's failure to compile an appellate record allowing this court to consider the content of all of the challenged photos forfeits his claim they were cumulatively prejudicial.  In any event, his challenge also fails on the merits.

27

photographs "included [him] holding guns,[5] in one possibly a Glock, gang graffiti with the word 'Temper' (his aka) and screen shots of [him] making gang signs alone or with others," the photographs were relevant to establish his membership and dedication to the OKB gang and were not more inflammatory than the current offenses. (*Ewoldt, supra*, 7 Cal.4th at p. 405.) The photo of gang graffiti that said "Temper" could not have prejudiced the defense; Phonsongkham's gang moniker of "Temper" was one of the pillars of its heat of passion theory. The fact that Phonsongkham made gang hand signs tended to establish him as a member of OKB and was not unduly prejudicial.

(v)     Law Enforcement Testimony About Field Interviews and Holding Cell Graffiti—Categories (5) and (6)

As we have discussed, four officers testified about three field interviews with Phonsongkham that took place in November 2015, April 2017, and October 2018. One crime—spray painting graffiti—was revealed during this testimony. Deputy Barrios testified about his July 2020 discovery of the OKB gang name carved in the holding cell after it was occupied (alone) by Phonsongkham. The evidence of the field interviews and holding cell graffiti was relevant to show he was a longstanding member of OKB who not only remained a gang member at the time of the May 2019 offense, but was sufficiently committed to his gang and entrenched in gang culture that he would react violently to the news of a rival gang's assault of an OKB gang

---

5     Exhibits 226 through 263 were shown to the jury as Detective Perez testified. The only photograph he described in his testimony was a single photograph introduced as Exhibit 253. Perez testified the individual in this photograph was Phonsongkham, and that he "appear[ed]" to have "a handgun, maybe a Glock handgun," in his hand. Perez testified he located additional photos of Phonsongkham with firearms, but it was not clear these photos were shown to the jury.

member.  Although crimes were revealed during this testimony, they were no more inflammatory than the charged crimes.  (*Ewoldt, supra,* 7 Cal.4th at p. 405.)

2.    *The Challenged Gang Evidence Was Not Prejudicial When Considered Collectively*

In addition to determining that no undue prejudice resulted from introduction of the individual items of evidence Phonsongkham challenges, we also are not persuaded they were impermissibly cumulative or unduly prejudicial in the aggregate.

In *Williams*, the case on which Phonsongkham principally relies, the defendant was charged with four counts of nonviolent substantive offenses,[6] a fifth count of participation in a criminal street gang under Penal Code section 186.22, subdivision (a), and gang enhancement allegations under section 186.22, subdivision (b), attached to the first four counts.  (*Williams, supra,* 170 Cal.App.4th at p. 595.)  In the course of the defendant's unbifurcated trial, the trial court admitted evidence of three prior crimes involving the defendant; 15 additional crimes and law enforcement contacts involving the defendant; as well as eight gang-related crimes, two of which involved the defendant, that were designated as predicate offenses.  (*Id.* at pp. 598–602.)  Some of the crimes were introduced multiple times and for multiple purposes, "including (1) under Evidence Code section 1101, subdivision (b), (2) as predicate crimes for the gang enhancements and [the]

---

6    Felon in possession of a firearm (Pen. Code, former § 12021, subd. (a)(1)) and ammunition (Pen. Code, former § 12316, subd. (b)(1)), possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)), and possession of a controlled substance while armed (Health & Saf. Code, § 11370.1).  (*Williams, supra,* 170 Cal.App.4th at p. 595.)

substantive gang crime, and (3) as the basis for expert opinion testimony." (See *id.* at p. 598, fn. 5.)

The appellate court concluded it was "an abuse of discretion to admit cumulative evidence concerning issues not reasonably subject to dispute. The sheer volume of evidence extended the trial—and the burden on the judicial system and the jurors—beyond reasonable limits, and the endless discussions among the trial court and counsel concerning the admissibility of such evidence amounted to a virtual street brawl." (*Williams*, *supra*, 170 Cal.App.4th at p. 611.)

Phonsongkham does not contend the evidence he challenges concerned issues not reasonably subject to dispute. To the contrary, in his opening brief on appeal, he explicitly acknowledges that "[t]o prove an underlying gang motive and intent, it was *essential* that the jury understand: (1) that the OKB and LV13 are rival gangs, (2) that [Phonsongkham] and [Anthony] were OKB gang members or associates, while [Carlos] and the group he was with were gang members or associates, (3) that rival gangs will fight and defend if one of their members is hurt or risk consequences from the gang, and (4) that witnesses are recalcitrant to testify, fearful of retaliation if they cooperate with police." (Italics added.) We agree. And the gang evidence in categories (1) through (6) above tended to prove one or more of these points, which in turn served to establish Phonsongkham's motive and intent in committing the shooting, which were the critical issues in dispute at trial. And although the evidence in categories (4), (5), and (6) were admitted for the same purpose—to prove Phonsongkham's membership and degree of commitment in the OKB gang—each individual item of evidence, on its own, was relatively weak. There were no outright admissions of gang membership by Phonsongkham. It was only in the aggregate that the evidence tended to

30

support the prosecution's position that Phonsongkham was a longstanding, committed gang member and remained affiliated with OKB at the time of the shooting. Defense counsel's questioning of law enforcement witnesses elicited that Phonsongkham had covered over his 49th Street tattoo, suggesting Phonsongkham may have withdrawn or at least distanced himself from the gang before the May 23, 2019 shooting. Thus, the issue and depth of his commitment to the gang was reasonably in dispute, and the quantity of evidence offered on these points was not unreasonable.

Phonsongkham's chief complaint is that while the challenged gang evidence was probative, not all of it was necessary. In his view, the jury would have been equally capable of evaluating his motive and intent, among other relevant issues, with only a subset of the evidence. But Phonsongkham's capacity to imagine an effective trial presentation on a lesser showing does not establish that the trial court abused its discretion by admitting a broader scope of evidence. "[T]he prosecution cannot be compelled to ' "present its case in the sanitized fashion suggested by the defense." ' " (*Tran*, *supra*, 51 Cal.4th at p. 1049, quoting *People v. Salcido* (2008) 44 Cal.4th 93, 147.)

Phonsongkham's other arguments are equally unavailing. His complaint that the defense theory that his relationship with Anthony transcended gang membership was "all but obliterated from serious jury consideration by the overlay of gang evidence" does not establish the type of prejudice Evidence Code section 352 was designed to prevent. " ' "The prejudice that section 352 ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." ' " ' " (*Tran, supra*, 51 Cal.4th at p. 1048.) "[T]hat the evidence

31

tended to establish elements of the prosecution's case did not render it prejudicial for purposes of Evidence Code section 352." (*Id.* at p. 1050.)

Phonsongkham complains that Detective Escamilla's testimony took up 65 pages of the trial record and Detective Caropreso's testimony took up 33 pages of the trial record. However, the vast majority of Escamilla's testimony pertained to LV13, and (as we have discussed) Phonsongkham has forfeited any objection under Evidence Code section 352 to the admission of this testimony. Also, the "length of [a] gang expert's testimony alone" does not establish it to have been cumulative or unduly prejudicial. (*People v. Coneal* (2019) 41 Cal.App.5th 951, 964.) In comparison with the 1,856 pages of witness testimony in the reporter's transcript, Escamilla and Caropreso's testimony was not excessive and did not exceed reasonable limits. Nor did the volume of the challenged evidence as a whole approach anything near the circumstance that led the *Williams* court to declare the admission of evidence impermissibly cumulative. (See *Williams*, *supra*, 170 Cal.App.4th at p. 611.)

And to the extent Phonsongkham argues that Evidence Code section 352 is not an effective safeguard "against a fundamentally unfair trial," our role is to apply section 352 as written, not to expand upon it. (See *In re J.C.* (2017) 13 Cal.App.5th 1201, 1207 [" 'Courts do not sit as super-legislatures to determine the wisdom, desirability or propriety of statutes enacted by the Legislature.' "].)

Finally, the trial court gave a limiting instruction, which mitigated any potential for prejudice created by introduction of the gang evidence. "As part of the [Evidence Code] section 352 prejudice analysis, courts consider whether the trial court gave a limiting instruction. A limiting instruction can ameliorate section 352 prejudice by eliminating the danger the jury could consider the evidence for an improper purpose." (*People v. Hendrix* (2013)

32

214 Cal.App.4th 216, 247; see *People v. Foster* (2010) 50 Cal.4th 1301, 1332 [where the jury was instructed not to consider prior crimes evidence to prove that defendant was a person of bad character, thus " 'minimizing the potential for improper use' "].) The court instructed the jury pursuant to CALCRIM No. 1403 that it could not consider the gang evidence to prove that he was "a person of bad character" with "a disposition to commit crime." We presume the jury followed the court's instruction. (*Ramos, supra*, 77 Cal.App.5th at p. 1132.)

In sum, we conclude the trial court did not abuse its discretion under Evidence Code section 352 by admitting the gang evidence summarized in categories (1) through (6) above. Because there was no state law evidentiary error, Phonsongkham's state and federal constitutional rights to due process of law were not violated.[7] (*People v. Hovarter* (2008) 44 Cal.4th 983, 1010 (*Hovarter*) ["The 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.' "].)

## II.

### *We Do Not Consider Phonsongkham's Withdrawn Claim That He Is Entitled to an Additional Day of Presentence Custody Credits*

At sentencing, the trial court gave Phonsongkham credit for 1,009 days of presentence custody credits, a calculation that was based on a confinement date of May 24, 2019. In his opening brief on appeal, Phonsongkham took the position he was deprived of one day of presentence credits because he was arrested on May 23 at 11:00 p.m., not May 24. He withdrew this claim, however, in response to the People's counterargument that credits begin to

---

[7] Because we find no error in the admission of the challenged evidence, we need not and do not address the merits of the parties' competing arguments regarding the harmlessness of the asserted error.

accrue when a defendant is booked into jail, not when he is arrested (*People v. Ravaux* (2006) 142 Cal.App.4th 914, 919–921), and the evidence indicates Phonsongkham's booking could have taken place no sooner than May 24.  As this claim of error has been withdrawn, we do not consider it.

III.

*The Abstract of Judgment Must Be Corrected*

The parties agree the trial court made a mathematical error when it pronounced sentence.  As noted above, the trial court sentenced Phonsongkham to an indeterminate term of life without the possibility of parole for the special circumstances murder in count 1, and a total determinate term of 13 years and four months for the attempted murders and shooting at an inhabited dwelling in counts 2 through 5.  It also imposed and executed five 25-year-to-life terms, one for each of the firearm enhancement allegations under Penal Code section 12022.53, subdivision (d), attached to counts 1 through 5.  It ordered all of the terms to run consecutively.

In aggregating the terms, the trial court stated the total sentence was 13 years, four months, plus 150 years to life, plus life without the possibility of parole.  The parties agree (as do we) that this was incorrect, because five 25-year-to-life sentences equals 125 years to life, not 150 years to life.

Both parties take the further position that this mathematical error was not carried over into the abstract of judgment.  In this respect, however, they are incorrect.  Although the abstract of judgment correctly identifies each of the individual terms imposed by the trial court, it also contains the inaccurate aggregation of the terms.  Specifically, section 16 of page two of the abstract of judgment states, "Total term:  13.4 Years + *150 Years to Life* + Life without Parole."  (Italics added.)

34

The trial court's oral pronouncement of judgment controls over the abstract of judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185–188.) There is no dispute the trial court's oral pronouncement of sentence resulted in a total term of 13 years, four months, plus 125 years to life, plus life without the possibility of parole, which is not the total term set forth in the abstract of judgment. "It is, of course, important that courts correct errors and omissions in abstracts of judgment." (*Id.* at p. 185.) We will remand to the trial court with directions to correct the error.

DISPOSITION

The judgment is affirmed.

The matter is remanded to the trial court with directions to correct the abstract of judgment to reflect that Phonsongkham's total term is 13 years, four months, plus 125 years to life, plus life without the possibility of parole. The court shall forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


DO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


DATO, J.

35